IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 26, 2025 Session

**STATE OF TENNESSEE v. KEVIN R. NEWMAN**

**Appeal from the Criminal Court for Knox County**
**No. 122960    G. Scott Green, Judge**

_____

**No. E2024-00600-CCA-R3-CD**

_____

Defendant, Kevin R. Newman, appeals his Knox County Criminal Court jury convictions of aggravated burglary and vandalism of property valued at more than $1,000 but less than $2,500, arguing that the trial court erred by admitting certain testimony, by refusing to declare a mistrial, and by providing a jury instruction on flight. He also challenges the sufficiency of the convicting evidence. Upon review, we find no error and, accordingly, affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., and W. MARK WARD, SP. J., joined.

Gregory P. Isaacs and Michael R. Fitzgerald (at trial and on appeal); and Ashlee B. Mathis (at trial), Knoxville, Tennessee, for the appellant, Kevin R. Newman.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; and TaKisha Fitzgerald and Robert Debusk, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Knox County Grand Jury charged Defendant with the aggravated burglary of Amanda Lane's residence and the damage or destruction of more than $1,000 worth of property belonging to Blaine Stewart, the owner of the residence, on April 11, 2020.

On April 11, 2020, Aaron Armes was outside his home on Birchfield in the Solway area of Knox County when he "heard a big loud crash" and "a racket" coming from the house that Ms. Lane rented from Blaine Stewart. The sound caught his attention because there were no cars in the driveway of Ms. Lane's residence and because he knew that Ms.

Lane had decamped to her mother's house at the onset of the Covid-19 pandemic. Mr. Armes went to investigate and observed a man wearing red pants, a gray jacket, a black hat, and black shoes exit Ms. Lane's residence through the screen door carrying a box. Mr. Armes saw the man, whom he later identified as Defendant, put the box down to pull his pants up. When Defendant saw Mr. Armes, he walked around the corner of the house away from Mr. Armes.

Concerned, Mr. Armes asked his wife to call Ms. Lane while he continued watching the residence. When he could no longer see Defendant, Mr. Armes got into a white Hummer and drove to the main road so that he could see into Ms. Lane's backyard. Mr. Armes did not see anyone, so he continued to drive down Oak Ridge Highway and eventually saw Defendant, whom he identified by the clothes he was wearing, speaking to the driver of "a Chevy black pickup" at the Raceway Market. Mr. Armes did not see the box that Defendant had carried away from Ms. Lane's residence. Mr. Armes drove behind the truck, and Defendant cursed and threatened him; the driver of the pickup drove away.

Mr. Armes called 911 to report that Defendant was at the Raceway Market. Defendant used a cell phone to make a phone call and, shortly thereafter, "a red Kia with chrome wheels" pulled into the parking lot. Defendant got into the car, which was driven by a woman dressed in blue scrubs. Mr. Armes followed the car as it exited the Raceway Market and remained on the phone with Knox County 911 until the car crossed into the City of Oak Ridge. Mr. Armes's call was transferred to the City of Oak Ridge 9-1-1, and he continued to follow until officers from the Oak Ridge Police Department (ORPD) told him to "back off."

Mr. Armes drove toward his house, but before he arrived, an ORPD officer called to ask that he come to a particular address to identify the man he had seen exiting Ms. Lane's residence with a box in his hands. Upon arriving at the address, Mr. Armes saw the red Kia, the woman in blue scrubs, and Defendant, who was wearing the same clothes he wore when Mr. Armes had seen him earlier. Mr. Armes, a veteran, recalled that a tattoo of the American flag on Defendant's neck had drawn his particular attention.

After identifying Defendant, Mr. Armes drove to Ms. Lane's residence, where officers stood outside with Ms. Lane and her boyfriend. One of the officers questioned Mr. Armes. After answering the officer's questions, Mr. Armes examined the area around the house, where he observed footprints in the mud, trampled grass, and, eventually, some of Ms. Lane's belongings strewn on the ground.

Mr. Armes said that he had observed a black truck at Ms. Lane's residence a few days before the incident involving Defendant, but he did not see anyone carrying property out of the residence at that time. Mr. Armes had also seen Defendant walking on the road near Ms. Lane's residence twice before April 11, 2020.

Ms. Lane[1] testified that on April 11, 2020, she and her two children lived in a house on Birchfield that she rented from Blaine and Shelley Stewart. On that day, Mr. Armes's wife, Brandy Freeny, called and asked Ms. Lane if she was moving. Ms. Lane, who was staying in Loudon at the time, "freaked out" and called the Stewarts because she thought "someone was breaking into the house." She then drove to the residence, and when she went inside, she found that her belongings were "destroyed and all over the place. The TV down and broken. . . . it was a disaster." The back door was broken, as were the French doors inside the house; she found a tire iron on her son's bed.

Ms. Lane said that most of her jewelry and her designer handbags and clothing were missing. Some of the clothing belonging to her children was also missing. Mr. Armes later found one of her handbags in a "wooded area right beside the house in between the gas station and the house." Ms. Lane did not give Defendant, whom she did not know, permission to enter her home or take her possessions.

Blaine Stewart, who owned the house, said that he went to the house after Ms. Lane called and found "a ransacked house. Drawers and things knocked over, and things on the floor, and drawers emptied. It was just like TV." Mr. Stewart estimated damages of $1,500 based upon the cost to replace the doors, television, and broken glass in the house. He said that he did not give Defendant, whom he did not know, permission to enter the house or to damage the property.

ORPD Officer John Thomas[2] testified that at approximately 6:30 p.m. on April 11, 2020, he received a "be on the lookout" (BOLO) dispatch that "a citizen was following an alleged burglary suspect from Solway into Oak Ridge" in "a shiny red new Kia boxy vehicle." Shortly after parking his cruiser in a parking lot that allowed for observation of the roadway, he saw a vehicle matching the BOLO, so he turned to follow the car, which

---

[1] By the time of the trial, Ms. Lane had taken the last name Hayward. We use the surname listed in the indictment to avoid confusion.

[2] At the time of trial, Mr. Thomas had become Chief of Police for the town of Rocky Top, Tennessee.

- 3 -

was headed east toward Clinton. Officer Thomas activated his emergency equipment and effectuated a traffic stop.

Upon approaching the vehicle, he observed a female wearing scrubs in the driver's seat and Defendant seated in the passenger seat. Officer Thomas asked Defendant to exit the vehicle and then placed him into the cruiser of another ORPD officer. Other officers searched the red Kia and placed the contents on the hood of the vehicle. Among the contents, Officer Thomas saw "a gray jacket with a black liner." He also saw "bits of glass" on the jacket, on the hood of the vehicle, and "on the pavement in front of the left front wheel."[3] Body worn camera footage captured Defendant admitting that Mr. Armes saw him walking through Ms. Lane's yard and through the adjacent field to the Raceway Market. He claimed to be looking for his cell phone in the area.

The State rested its case, and following a full *Momon* colloquy, Defendant elected not to testify but chose to present proof.

Kevin Lindsay testified that he drove his black Chevrolet pickup truck to the Raceway Market on April 11, 2020. An individual with several tattoos approached him, and Mr. Lindsay let the man use his cell phone to make a call. Mr. Lindsay said that the man did not put any items in his truck. Mr. Lindsay left after the individual returned his phone. Mr. Lindsay did not see a white Hummer pull into the gas station.

Defendant's ex-wife, Christina Perdue, testified that she drove Defendant to the Solway area on April 11, 2020, to look for his lost cell phone, which "was pinging in that area." She initially drove to a church parking lot, and they drove slowly around the area with the windows down, hoping to hear the phone pinging. Eventually, they split up so that she could search one side of Oak Ridge Highway while Defendant searched the other. Shortly after she dropped Defendant off to begin his search, she received a call from an unknown number. When she answered, Defendant asked her to pick him up at the Raceway Market because "there was some guy following him." Ms. Perdue said that Defendant did not have any items with him when he got into her car.

Defendant pointed out Mr. Armes' white Hummer before they left the parking lot. When they pulled out of the parking lot, the white Hummer followed. Ms. Perdue said that the vehicle followed at a close distance, which made her nervous, so she took an indirect route to her house. After the white Hummer got caught at a traffic light, Ms. Perdue

---

[3] We have omitted the testimony of other witnesses not necessary to the outcome of this appeal.

decided to drive straight home. Before they arrived at her house, they were pulled over by the ORPD. After Defendant was taken from Ms. Perdue's car and placed into a police cruiser, the white Hummer arrived, and the driver of the Hummer pointed at Defendant.

Based upon this evidence, the jury convicted Defendant as charged. Following a sentencing hearing, the trial court imposed concurrent sentences of fifteen years for the conviction of aggravated burglary and six years for vandalism to be served at 60 percent based on Defendant's status as a Career Offender. Defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal.

## Analysis

In this appeal, Defendant challenges the admission of Officer Thomas's testimony about the glass found in the gray jacket that was removed from Ms. Perdue's car, the trial court's refusal to grant a mistrial, the court's provision of a jury instruction on flight, and the sufficiency of the convicting evidence. We consider each claim in turn.

### I. Officer Thomas's Testimony

Defendant contends that the trial court erred by permitting Officer Thomas to testify that he observed broken glass on the gray jacket that was pulled from the red Kia, on the hood of the vehicle, and on the pavement following the search of the car, claiming that the testimony was irrelevant. The State asserts that the evidence was relevant to connect Defendant to the burglary of Ms. Lane's residence, noting other evidence that glass was broken inside the house.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and we will not interfere with the exercise of this discretion in the absence of clear abuse appearing on the face of the record. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992). "A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or

-5-

employs reasoning that causes an injustice to the complaining party." *State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014) (citing *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)).

Here, the presence of glass inside and outside the red Kia, and particularly on Defendant's gray jacket, tended to make it more likely that Defendant vandalized and burglarized Ms. Lane's home. The glass was discovered only a short time after Mr. Armes observed Defendant exiting Ms. Lane's residence wearing a gray jacket. That Officer Thomas did not conduct the search does not alter our conclusion because Officer Thomas testified that he personally observed glass on the jacket, the hood of the car, and the pavement outside the car. Similarly, the absence of forensic evidence establishing an exact match between the glass found in the car and the glass in Ms. Lane's home does not make the discovery of broken glass any less relevant. This issue is without merit.

## II. Failure to Declare a Mistrial

Defendant next contends that the trial court should have declared a mistrial when the jury indicated that they were deadlocked. The State argues that Defendant waived plenary review of this issue. The State asserts that Defendant has not asked for and is not entitled to plain error review of this issue. Defendant did not file a reply brief and, thus, has not addressed the State's assertion that he waived our review of this issue.

Sometime after the jury retired to deliberate, the trial court informed the parties that it intended to bring the jury in to ask whether they wanted to continue working into the evening or preferred to retire and return the following day. During this discussion, the court asked defense counsel, "[I]n the scenario where they do say that they are hopelessly deadlocked, if I were to declare a mistrial, would it be with the defendant's consent?" Defense counsel responded, "It would. And we would urge the Court not to go beyond the jury's admonition that they're deadlocked. We would ask that you accept that representation." The court stated that it would "explain the options to them, and I won't tell them to take the other side of the argument and argue about that."

The trial court then brought the jury into the courtroom and asked whether they wanted to continue working or retire for the evening and start fresh in the morning. The court added, "Or if you believe at this point in time that you are hopelessly deadlocked, you may so report." The foreperson asked for time to discuss the options. When the jury returned, the foreperson stated, "You Honor, I believe it would be the best interest for the State and the defendant if we were to adjourn for tonight and allow us to reengage tomorrow with a fresh mind."

The jury reported for deliberations at 9:00 a.m. the following morning. At some point in the morning, the jury sent a note to the trial court that read:

> Jury has not reach[ed] a consensus on the 1st count of [a]ggravated burglary. Request further guidance per jury instructions to prevent a hung jury.

The court sent a written response that read, "You must rely upon the instructions as given." According to Defendant's brief, "the court addressed the note in chambers with the parties and indicated that it would address the deadlock with the jury on the record." That discussion was not transcribed.

At some point in the afternoon, the trial court brought the parties in to tell them that the court intended to bring the jury into the courtroom to "take[] their temperature." The court said it intended to tell the jury, "It's okay if you can't agree, but we're going to have to shut this down at 3:00 because of the parade that's coming through." Both parties stated that they did not object to this procedure. When the jury returned to the courtroom, the foreperson stated, "I do believe further deliberations may yield benefit." The court then advised the jury that the city would begin closing roads for a parade at 3:00 p.m. but that they would be permitted to deliberate until that time and that the court would "await your announcement about what step forward we need to take."

The jury later returned a unanimous verdict of guilty on both charges. The trial court polled the jurors, who each indicated their agreement with the verdict. After the jury rendered its verdicts and was discharged, Defendant moved the court to grant a mistrial "under your authority as a 13th juror" and to conclude that the jury's note "saying that they were deadlocked on Count I asking guidance was a mistrial." The court denied the motion and affirmed the jury's verdict as thirteenth juror, saying, "I'm thoroughly convinced that the jury got it right."

In our view, Defendant has waived appellate review of this issue. First, Defendant failed to object, at any point, to the procedure employed by the trial court. *See State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008) ("The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal."). Second, Defendant failed to request a mistrial before the jury rendered its verdict and was discharged. *See* Tenn. R. App. P. 36(a) ("Nothing in [Rule 36] shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Finally, Defendant failed to prepare an adequate record for review. In his brief, Defendant states that a critical discussion of the jury's note asking for further guidance "to avoid a hung jury" took place in the trial judge's chambers. A transcript of that discussion was not included in the record on appeal. As the appellant, Defendant bears the burden of preparing a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "Where . . . the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which a party relies, this Court is precluded from considering the issue." *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1998) (citing *State v. Groseclose*, 615 S.W.2d 142, 147 (Tenn. 1981); *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981)). Importantly, "[i]n the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." *State v. Bibbs*, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing *Smith v. State*, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); *Vermilye v. State*, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)).

Whether properly assigned or not, this court may review an issue for plain error. *See* Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). However, Defendant did not ask this court to exercise our discretion to undertake plain error review of this issue, even after he was alerted to the waiver by the State's brief. As the appellant, Defendant bears the burden of establishing entitlement to plain error review. *See, e.g., State v. Reynolds*, 635 S.W.3d 893, 931 (Tenn. 2021) (citation omitted). The first and best way to obtain plain error review is to ask for it. *See State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023) ("Because the '[d]efendant bears the burden of persuasion to show that he is entitled to plain error relief,' a defendant's failure to request this relief weighs against any such consideration on our own." (first quoting *State v. Dixon*, No. M2021-01326-CCA-R3-CD, 2022 WL 5239289, at *21 (Tenn. Crim. App. Oct. 6, 2022); and then citing *State v. Cornwell*, No. E2011-00248-CCA-R3-CD, 2012 WL 5304149, at *18 (Tenn. Crim. App. Oct. 25, 2012)) (alteration in *Thompson*). At the very least, Defendant should have responded to the State's assertion of waiver. *Thompson*, 2023 WL 4552193, at *5 ("Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our *sua sponte* consideration of plain error relief." (citing *State v. Powell*, No. W2011-02685-CCAR3-CD, 2013 WL 12185202, at *8 (Tenn. Crim. App. Apr. 26, 2013)). Because the record does not demonstrate the existence of circumstances that are "particularly compelling or egregious," we decline to consider this issue any further.

## III. Jury Instruction on Flight

The State asked the trial court to provide an instruction on flight, and Defendant objected, arguing that the instruction was inapplicable because there was no proof that Defendant fled from law enforcement officers. The State conceded that Defendant did not flee from officers but nevertheless argued that the instruction was applicable based on Defendant's flight from Mr. Armes. The trial court concluded that the instruction was proper because Defendant fled after being spotted by Mr. Armes leaving Ms. Lane's residence.

The trial court instructed the jury as follows:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

> The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be hurried or concealed department [sic], or it may be a concealment with[in] the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown to constitute flight.

> If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt o[r] innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

> Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

The constitutional right to trial by jury, *see* U.S. Const. amend VI; Tenn. Const. art. I, § 6, imposes upon the trial court a duty "to give a complete charge of the law applicable to the facts of a case," *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see also* Tenn. R. Crim. P. 30. We review the legal accuracy of the trial court's instructions de novo with no presumption of correctness, *see Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007), and the propriety of a given instruction de novo with a presumption of correctness, *see Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004).

The trial court may instruct the jury on flight as an inference of guilt when the record contains evidence of "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community." *State v. Payton*, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989) (quoting *Rogers v. State*, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970)); *see State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). "A flight instruction is not prohibited when there are multiple motives for flight," and "[a] defendant's specific intent for fleeing a scene is a jury question." *Berry*, 141 S.W.3d at 589.

The flight instruction provided by the trial court was a correct statement of the law, *see id.* at 588, and the evidence supported the trial court's giving it. When spotted by Mr. Armes in Ms. Lane's yard, Defendant walked behind the house and continued through the woods to avoid Mr. Armes. When he spotted Mr. Armes at the Raceway Market, Defendant left with Ms. Perdue. Although Ms. Perdue stopped when Officer Thomas activated his emergency equipment, Defendant's previous conduct supported the giving of the instruction. Contrary to Defendant's argument, the trial court did not instruct the jury that it *must* infer Defendant's guilt from his flight. Instead, in keeping with the applicable law, the court instructed the jury, "Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine." Defendant is not entitled to relief on this issue.

## IV. Sufficiency of the Evidence

Finally, Defendant contends that the evidence adduced at trial was insufficient to support his convictions, arguing that Mr. Armes's "testimony was simply unbelievable" and that the State failed to establish his identity as the perpetrator of the damage to the house. The State asserts that the evidence was sufficient.

We review a challenge to the sufficiency of the convicting evidence to determine whether, "after viewing the evidence in the light most favorable to the prosecution" and providing the State with "the strongest legitimate view of the evidence as well as all

reasonable and legitimate inferences which may be drawn therefrom," "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations omitted); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citations omitted); Tenn. R. App. P. 13. Our review "is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). Importantly, a guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, shifting the to the defendant to demonstrate why the evidence is legally insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

The jury, as the trier of fact, resolves all questions involving the credibility of the witnesses, the weight and value to be given to evidence, and the factual disputes raised by such evidence. *See Dorantes*, 331 S.W.3d at 379 (citing *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). Accordingly, this court will neither re-weigh nor reconsider the evidence when evaluating the sufficiency of the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

As charged in the indictment, "[a]ggravated burglary is burglary of a habitation as defined in §§ 39-14-401 and 39-14-402." Tenn. Code Ann. § 39-14-403 (2020).[4] A habitation is "any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons." *Id.* § 39-14-401(1)(A). "A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit . . . theft . . . ." *Id.* § 39-14-402(a)(1). "A person commits the offense of vandalism who knowingly . . . [c]auses damage to or the destruction of any real or personal property of another . . . knowing that the person does not have the owner's effective consent." *Id.* § 39-14-408(b)(1).

Defendant does not argue that Ms. Lane's residence was not burglarized or that Mr. Stewart's property was not damaged and does not contest Mr. Stewart's valuation of the damage. Instead, he invites this court to revisit the credibility of Mr. Armes's testimony establishing his identity as the perpetrator of the burglary and vandalism. We must decline this invitation. *See Dorantes*, 331 S.W.3d at 379 (stating that the jury is the final arbiter of witness credibility); *Stephens*, 521 S.W.3d at 724 (stating that the appellate court does not reweigh or reconsider evidence). In the light most favorable to the State, Mr. Armes saw

---

[4] The crimes of burglary and aggravated burglary are now codified at Tennessee Code Annotated sections 39-13-1002 and -1003. *See* 2021 Tenn. Pub. Acts 545, § 3 (effective July 1, 2021).

Defendant exit Ms. Lane's house carrying a box. Defendant fled the scene through the woods, and, when spotted by Mr. Armes at the Raceway Market, he fled with Ms. Perdue into Oak Ridge. Ms. Lane testified that someone broke into her home, ransacked it, and took possessions belonging to her and her children, some of which were found along the path that Defendant took from the property. When arrested, Defendant wore the same clothes as he did when initially spotted by Mr. Armes, and a gray jacket found inside Ms. Perdue's car bore bits of glass. Defendant admitted that Mr. Armes saw him walking through Ms. Lane's yard and through the adjacent field to the Raceway Market. Mr. Stewart, who owned the house, testified that he spent more than $1,500 repairing the damage inside the house. This evidence was sufficient to support both of Defendant's convictions, and he is not entitled to relief.

## Conclusion

Based upon the foregoing analysis, we affirm the judgments of the trial court.

s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE